**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**Greenbaum, Rowe, Smith & Davis LLP**
PO Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
David L. Bruck, Esq.
dbruck@greenbaumlaw.com
Proposed Counsel to the Debtor and Debtor in Possession

In re:

**JOSEPH S. COHEN,**

Debtor.

Chapter 11

Case No. 25-18758-(MEH)

## DECLARATION OF JOSEPH S. COHEN
## IN SUPPORT OF FIRST DAY MOTIONS

I, Joseph S. Cohen, hereby declare under the penalty of perjury:

1.  I am an individual debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). I am submitting this declaration on my own behalf.

2.  Except as otherwise indicated, the facts set forth this declaration are based upon my personal knowledge, my review of the relevant documents, input I received from my bankruptcy counsel, Greenbaum Rowe Smith & Davis LLP (the

11021003.1

"<u>Greenbaum Firm</u>"), and my other advisors. If called upon to testify, I would testify competently to the fact set forth herein.

3. I engaged the Greenbaum Firm to assist me to prepare for the filing of Chapter 11 proceedings and provide me with an opportunity to reorganize my assets and liabilities pursuant to a Chapter 11 Plan of Reorganization.

4. I submit this declaration to provide the Court with information regarding this case and in support of the relief as set forth In the First Day Motions. I have reviewed my petition and the First Day Motions and believe that the commencement of this Chapter 11 Case and the relief sought in the First Day Motions will all be in the best interests of my estate, creditors, and other parties in interest, and are necessary to preserve and maximize the value of my bankruptcy estate.

5. This declaration has three parts. Part I provides an introduction and overview of my business background and an explanation of the circumstances leading to this Chapter 11. Part II provides a summary of my assets and liabilities, a listing of pending litigation and refers the Court to the Petition for further information. Part III provides a brief summary of the First Day Motions and the factual bases for the relief requested therein.

I. **Introduction and Background**

6. I grew up in Brooklyn, New York during the 1980's. My father operated several True Value home centers which provided a fresh look at new products coming to the home improvement, gardening and home maintenance market to the customers.

7. Both of my parents worked at my dad's stores. My fondest childhood memories were of walking the aisles of his stores surveying the different departments: hardware, plumbing, electrical, lawn and garden, cleaning supplies, home goods, and more. I spent after-school hours, weekends, and summers in his stores watching my parents, and the stores' employees attending to their customers. The time I spent in my dad's hardware stores taught me many valuable lessons which I carried into my adult professional life, and specifically, that hard work, dedication to your craft, obsessing over customer service are keys to success.

8. In high school, I realized that there was an opportunity to expand my dad's brick-and-mortar, customer-centric hardware business to online. I built an eCommerce store and launched the first eCommerce division of his business. My early online retailing achievements were first recognized by Forbes in a December 2004 article titled "The Merchant of Bay Ridge."[1] One of the best-selling categories on the eCommerce site quickly became lawn and garden equipment, primarily snow blowers during the winter months. Demand for the snow blowers was often driven by frantic customers right before a storm frustrated that their gas-snow blower would not start. I realized that the typical homeowner could use an easy-to-use, gas-free, electric powered snow-removal tool that was affordable. So, in my junior year of high school, I developed the first prototype of the Snow Joe, an electric snow shovel. This was the start of my now-former company, Snow Joe, LLC ("Snow Joe").

---

[1] *See* https://www.forbes.com/forbes/2004/1227/080.html?sh=68fa52ba580e (last visited Aug. 23, 2023).

## **SNOW JOE LLC**

9. At inception in 2004, Snow Joe offered just one product: an electric-powered snow shovel that retailed for $99 called the "Snow Joe." Initially, we struggled to bring the product to market. It was rejected by traditional big box retailers and many people at the time believed I was crazy to try to sell a new technology-driven product in an industry dominated by major manufacturers that had for years been selling heavy-duty, gas-powered snow blowers. Ultimately, I leveraged my experiences selling through alternative eCommerce channels. Our first order came from the television shopping channel QVC. Within 10 minutes of being on QVC, we sold out of the "Snow Joe." Demand for Snow Joe products grew rapidly from then on.

10. Over the years, Snow Joe expanded its product selection to include other electric, manual, and cordless outdoor equipment. Snow Joe evolved into a robust, omni-channel, customer-centric business that offered a wide range of problem-solving tools to keep consumers' homes, yards, and gardens looking beautiful throughout the year. From battery-powered snow blowers and snow throwers, lighted snow brooms and roof rakes, to electric mowers and leaf blowers, pressure washers, watering equipment, tillers, trimmers, headers, and edgers, Snow Joe offered a solution for every season. Snow Joe focused on bringing to market all-electric, battery-powered tools that were more appealing to the homeowner than typical gas-powered equipment. Snow Joe took pride in designing tools that simplify customers' lives and make their tasks more enjoyable.

11021003.1

11. At its peak, Snow Joe generated annual retail sales of nearly $420 million from its website and retail partners including Amazon, Walmart, and Home Depot. Snow Joe employed over 500 dedicated associates at its peak.

12. Snow Joe operated through forecast commitments from brick-and-mortar retail partners who would forecast and consume inventory as needed. Due to the pandemic and the exceptional demand in 2020, the 2021 forecasts surged, and the same trend persisted until June 2022. In early 2022 investment bankers heavily solicited Snow Joe and promoted us to take the company public. Given Snow Joe's history, and the developing market trend against gas-powered equipment, it seemed logical to go public and obtain significant investment for expansion. In February 2022, Snow Joe executed a letter of intent with a reputable investment vehicle to go public through their special purposes acquisition vehicle (or "SPAC"), which valued Snow Joe at more than $1 billion.

13. However, in 2022 severe challenges to Snow Joe's business model arose, including, among other things, tariffs and the COVID-19 pandemic. Exemptions from tariffs on Snow Joe's products expired and new tariffs were imposed on products imported from China. The imposition of tariffs adversely impacted sales of Snow Joe's equipment substantially all of which came from China.

14. In addition, the soaring demand for consumer goods coupled with supply chain issues during and after the height of the pandemic caused Snow Joe's Ocean freight rates to rise to unprecedented levels. Historically, Snow Joe paid $2,000 per container for shipping, but the new rates substantially increased costs to nearly *$30,000 per container* at its peak in 2022. Snow Joe's overseas suppliers also

11021003.1

increased their prices by approximately 10-20% due to rising raw material costs, exchange rate fluctuations, and production capacity issues. Despite achieving a new record revenue of $412 million in 2021, Snow Joe could not increase prices to offset these rapid market changes. Snow Joe also fell behind its forecast for sales. In 2021 nearly all the forecasts given by Snow Joe's retail partners were fully met or exceeded. However, in 2022, only 50% of the forecasts were realized. This left Snow Joe with significant excess inventory.

15. The well-publicized supply chain issues suffered by companies across all industries—due to factory shutdowns in China, congestion and lack of staffing at domestic ports, an undersupply of trucks and chassis with which to transport containers—created an inability to get Snow Joe's inventory to distribution centers. This supply chain challenge caused Snow Joe to incur, among other things, millions of dollars in demurrage and drayage charges and penalties because there were not sufficient trucks and chassis to remove Snow Joe's containers from ports and other logistics hubs.

16. In or about March , 2021, Snow Joe entered into a renewed credit agreement with Wells Fargo Bank (the Credit Agreement) as an administrative agent for a lender group. Subsequently, the Credit Agreement was amended, modified, supplemented, extended, renewed, and restated from time to time (collectively, the "Credit Agreement"). Pursuant to the Credit Agreements, Snow Joe granted Wells Fargo a first position blanket lien on virtually all of its assets. Wells Fargo filed UCC-1 financing statements to perfect its liens.

17. The Credit Agreements contained customary provisions allowing Wells Fargo to declare the loans in default if Snow Joe's financial performance deteriorated or if Wells Fargo deemed itself insecure.

18. In May 2022, Wells Fargo sent a default notice and reservation of rights letter to Snow Joe. Negotiations with Wells Fargo commenced, and I invested much of my then personal wealth in Snow Joe to attempt to bring it into compliance with the Wells Fargo loan documents. Snow Joe negotiated a Forbearance Agreement with Wells Fargo which continued for more than a year.

19. In October 2023, a Second Forbearance Agreement was executed with Wells Fargo, but with continuing losses, it soon became apparent that Snow Joe needed a large infusion of capital to keep it operational. Despite efforts to find the needed capital, those efforts were unsuccessful.

20. As a result, and with pressure from Wells Fargo, and in light of continuing defaults in the Forbearance Agreement and the covenants under the Loan, Wells Fargo demanded that Snow Joe turn over and surrender its assets to Wells Fargo in an Article 9 transaction. At the time the secured debt owed by Snow Joe to Wells Fargo was in excess of $42,000,000 and Snow Joe's remaining assets were valued at far less. Snow Joe's continuing losses made operations impossible. Snow Joe turned over possession of its assets to Wells Fargo in February 2024.

21. Following the turnover and surrender of possession of the assets of Snow Joe to Wells Fargo, Wells Fargo entered into an agreement to sell Snow Joe's assets (IP, Equipment and Inventory) to Weather Brands, LLC, a Texas limited liability

11021003.1

company. Wells Fargo retained Snow Joe's accounts receivable to further reduce its debt.

22. I had guaranteed the Wells Fargo debt to Snow Joe; and as part of the transaction, I paid Wells Fargo $5,825,000.00, which funds reduced the obligation of Snow Joe to Wells Fargo and released me from my guaranty.

23. In connection with the sale by Wells Fargo to Weather Brands of the assets acquired from Snow Joe, Weather Brands paid Wells Fargo cash at closing approximately $26,235,000.00. There still remained a deficiency on the Wells Fargo debt and Wells Fargo took back a promissory note from Weather Brands to bridge the gap in funding from Weather Brands.

24. Weather Brands subsequently sold the physical assets purchased from Wells Fargo to a company called All Season Power LLC and licensed the IP to All Season Power LLC.

25. I presently am employed by All Season Power LLC as the CEO of the company and through an entity called ASP Owner 1 LLC own a small minority stake in All Season Power LLC. My 7.5% interest in ASP Owner 1 LLC is reflected in the Petition. The majority interest in ASP Owner 1 LLC and All-Season Power LLC is owned by third parties.

26. The surrender of the assets of Snow Joe to Wells Fargo and the loss of my personal wealth through the efforts to keep Snow Joe alive have brought me to this Chapter 11. As set forth below, my debts (secured and unsecured, liquidated and unliquidated) exceed $70,000,000 including guaranties and outstanding claims in litigation; and my remaining assets consist primarily of my 50% interest in three

limited liability companies which own my residence and adjacent land and a rental property in Long Branch, New Jersey, and minority interests held in various start up limited liability companies which are illiquid and whose value is speculative.

27. I have filed this Chapter 11 proceeding to propose and confirm a plan of reorganization which restructures my debt by the use of available assets and third-party funding to provide a distribution to holders of allowed claims in my bankruptcy.

II. **Summary of Assets and Liabilities**

    **A. Assets**

28. 19. My assets today are listed in my petition and consist primarily of my 50% interest in the real estate LLCs that own the houses and real estate on Pullman Avenue in Long Branch, New Jersey. I reside part time at 3 Pullman Avenue with my wife and children. This property was acquired in 2017. The house at 1 Pullman Avenue was acquired in 2021 and is leased to a third party, and 9 Pullman Avenue is vacant and part of 3 Pullman Avenue.

29. My wife owns the remaining 50% of the interest in the real estate LLCs. Recent appraisals (June 2025) of these properties prepared by Pyramid Real Estate Advisors value 1 Pulman Avenue at $4,800,000 and 3 Pullman and 9 Pullman Avenue at $9,500,000. There are mortgages encumbering 1 Pullman ($3.5M) and 3 Pullman ($1.9M) as set forth in the petition reducing the perceived equity held by the real estate LLCs to approximately $8,900,000 gross. My interest is no more than 50% of perceived equity. Sales of either or both of these properties by the LLCs would generate selling expenses in excess of $1,000,000 and federal and state taxes. The

11021003.1

mortgages are current. My economic interest in these LLCs is being valued by an expert. It is estimated to be less than $4,000,000.

30. I plan through the chapter 11 process to obtain sufficient funding from a combination of my compensation and third-party funding to enable a distribution to administrative claimants and unsecured creditors with cash at confirmation and additional payments over a period of time.

31. My other assets consist primarily of economic interests in limited liability companies owned by me in part and others and are all illiquid. The limited liability companies are all "startups" with funding provided by third party investors and in most cases managed in part by third parties. The chapter 11 process will provide an opportunity for me to have these economic interests properly valued so that I can fund a distribution to holders of allowed claims over time pursuant to a confirmed Chapter 11 plan.

### B. Liabilities

32. As noted, Snow Joe's financial difficulties and the Article 9 transaction left me with substantial financial obligations, all of which are listed in the petition and aggregate more than $70,000,000. Four of the claims against me are disputed as indicated in the Petition and have resulted in litigation.

33. The claims in litigation are as follows:

   a. Yuan Mei Corporation v Snow Joe LLC, Joseph Cohen, etal United States District Court in New Jersey- Claim is $8,337,000. (Pending)

   b. DKSJ LLC v Joseph Cohen- New York Supreme Court- Claim of $10,000,000 plus attorney fees and interest. An Order was recently

11021003.1

entered in this case entering summary judgment against me. I have filed a Notice of Appeal.

c. <u>Northrock Management LLC f/k/a Northrock Minerals LLC v Joseph Cohen</u>- United States District Court for the Southern District of New York- Judgment has recently been entered against me in the approximate amount of $8,000,000. I have filed a Notice of Appeal in this case.

d. <u>Wells Fargo Equipment Finance Inc v Joseph Cohen and Edward Cohen</u>- United States District Court for the Southern District of New York- Claim is a claim on a guaranty in the amount of $3,700,000 (Pending)

### III. Summary of First Day Pleadings

34. The first day pleadings are limited to two, namely (1) a motion to authorize the Debtor to open a DIP account at EastWest Bank in accordance with the UST Guidelines and to approve the Debtor's Liquidity Projection and to open a professional fee escrow account at EastWest Bank and (2) a motion to allow me to pay and continue to pay premiums on the insurance policies presently in effect that protect me and my assets from casualty and liability.

35. The motion to authorize the Debtor to open a DIP account and approve its Liquidity Projection during the pendency of this case as well as to open a professional fee escrow account at EastWest Bank if approved will facilitate compliance with the UST Guidelines and will protect professionals retained with court approval in this Case. In addition, approval of the Liquidity Projection will ensure that

11021003.1

the assets of the Debtor will be protected. Note that the Liquidity Projection includes the payment of my share of the costs of insurance premiums, real estate taxes and mortgage debts encumbering the real estate owned by LLCs in which I have an economic interest.

36. Establishing a professional fee escrow account will protect the professionals retained in the case with court approval. Professionals will file applications for compensation to the Bankruptcy Court in the ordinary course.

37. The motion to approve payment of the premiums on the insurance policies in effect is an effort to preserve and protect the assets of the bankruptcy estate. The policies and premiums are as listed in the Motion. The Debtor believes that all premiums are current as of the date of the petition and seeks approval of the continuation of the insurance policies as being in the best interest of the Debtor's estate and its creditors.

11021003.1

I certify that the foregoing statements made by me are true. I am aware that if any of the statements are willfully false, I am subject to punishment.

Dated:  August 21, 2025                By: _____

9883638.1